Kenneth **DRAYTON**, Alfred A. Smith, Wallace Gipson and Mary Hannan, Individually and as representatives of a class similarly situated, Plaintiffs,

v.

**CITY OF ST. PETERSBURG**, a municipal corporation, Zelma Greenway, as Fire Chief and Mack M. Vines, as Chief of Police, Defendants.

No. 75–128 Civ.–T–H.

United States District Court,
M. D. Florida,
Tampa Division.

March 7, 1979.

Supplemental Opinion Sept. 6, 1979.

Morris W. Milton, St. Petersburg, Fla., for plaintiffs.

Thomas C. Wright, Jr., St. Petersburg, Fla., and Richard A. Luce, Seminole, Fla., Asst. City Attys., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HODGES, District Judge.

This is a class action instituted by the named Plaintiffs pursuant to Rule 23, Fed. R.Civ.P. The Defendants are the City of St. Petersburg, its Fire Chief (Defendant Greenway), and its Chief of Police (Defendant Vines).

The claim asserted is that the Defendants have discriminated against the Plaintiffs, as black persons, and the class they represent, by denying employment on the basis of race in violation of the Fourteenth Amendment, and 42 U.S.C. §§ 1981, 1983 and 2000e et seq. (Title VII of the Civil Rights Act of 1964, as amended). Jurisdiction is predicated upon 28 U.S.C. § 1343(3) and (4).

By previous Orders entered pursuant to Rule 23(c), Fed.R.Civ.P., the case has proceeded as a class action and the Plaintiffs have been certified as representing a Rule 23(b)(2) class consisting of "all black persons who have in the past or will in the future apply for employment with the Police or Fire Departments of the City of St. Petersburg . . ." (Order entered May 31, 1977. See also Order entered June 2, 1978). Injunctive relief is sought in behalf of the class while the named Plaintiffs seek both injunctive relief and individual damages.[1]

Following two earlier continuances on joint motions filed by the parties, the case was tried before the Court without a jury on June 5–7 and November 20–21, 1978. Counsel have since submitted proposed findings with memoranda of law, and the case is ready for decision.

## FINDINGS OF FACT

The evidence may be grouped into two categories: (a) statistical data, both comparative and demographic; and (b) the circumstances surrounding the experiences of the named Plaintiffs, individually, as unsuccessful applicants for jobs with the City. There is also evidence of the named Plaintiffs' qualifications as compared with certain white persons who have been hired as Policemen or Firefighters, as the case might be.

### I

### THE STATISTICAL EVIDENCE

The relevant comparative statistics are somewhat fragmentary and must be drawn from a number of different sources in the record. In some instances the pertinent information is either unavailable in the evidence or is difficult to compare with corresponding data pertaining to other time periods because the records for the periods involved were maintained (or presented) in differing formats.

Nevertheless, the following table reflects all of the information disclosed by the record concerning the racial composition of the *Police Department* work force on the dates indicated.

---

1. Pursuant to an agreement of the parties confirmed by the pre-trial Order entered June 2, 1978, the named Plaintiffs' prayers for damages were reserved for future hearing, if necessary, following a trial to be conducted concerning the merits of Plaintiffs' claim (individually and as a class) for injunctive relief.

| Date | Total Employees | White (%) | Black (%) | Civilian Employees | White (%) | Black (%) | Uniformed Employees | White (%) | Black (%) |
|---|---|---|---|---|---|---|---|---|---|
| Sept. '73 | 484 | 458 (95%) | 26 (5%) | — | — | — | — | — | — |
| Feb. '74 | 625 | 580 (92.8%) | 45 (7.2%) | 248 | 218 (87.9%) | 30 (12.1%) | 377 | 362 (96%) | 15 (4%) |
| Jan. '75 | 622 | 579 (93%) | 43 (7%) | 175 | 159 (90.8%) | 16 (9.2%) | 447 | 420 (93.9%) | 27 (6.1%) |
| Jan. '76 | 697 | 645 (92.5%) | 52 (7.5%) | 216 | 189 (87.5%) | 27 (12.5%) | 481 | 456 (94.8%) | 25 (5.2%) |
| May '78 | — | — | — | — | — | — | 469 | 434 (92.5%) | 35 (7.5%) |

[Note: The data shown for September, 1973 through January, 1976 is derived from Plaintiffs' Ex. 90. The data shown for May, 1978 is derived from Defendants' Ex. 17. No information is available concerning composition by race prior to September, 1973].

The following table reflects the number and race of *Police Department* officers hired from March 24, 1972 through May 9, 1978.

| Total Hired | White (%) | Black (%) |
|---|---|---|
| 363 | 318 (87.6%) | 45 (12.4%) |

[Note: Derived from Defendants' Ex. 17].

The statistical evidence relating to the *Fire Department* is even less comprehensive than the data pertaining to the Police Department. Defendant Greenway (the Fire Chief) testified that there were no black firefighters prior to 1972. Beyond that date the record shows only that five blacks were hired in 1972, one in 1973 and two in 1974 (Plaintiffs' Ex. 91, Defendants' answer to interrogatory number 5); that on April 15, 1976 the Department had 314 white male employees and 10 black male employees (Plaintiffs' Ex. 91, Attachment F); and on May 1, 1978, there were 228 Firefighters of whom 219 or 96.1% were white and 9 or 3.9% were black (Defendants' Ex. 17).

In addition, the following table reflects the number and race of *Firefighters* hired from March 24, 1972 through May 9, 1978.

| Total Hired | White (%) | Black (%) |
|---|---|---|
| 124 | 112 (90.3%) | 12 (9.7%) |

The pertinent demographic statistics are as follows. Based upon the 1970 Census data, black persons constituted 10.8% of the total population of the Tampa-St. Petersburg Standard Metropolitan Statistical Area, and 14.75% of the population of the City of St. Petersburg itself.[2] A special census of the City of St. Petersburg, as of January 30, 1976, reflected a black person ratio of 16.05%.[3] The ratio of black persons in the Standard Metropolitan Statistical Area being 18 to 35 years of age and having a high school education is 9.6%; and the ratio of black *males*, meeting those conditions is 8.3%.[4]

## II

### THE OTHER EVIDENCE

(a.) *Generally.* Since at least 1974 the City of St. Petersburg has adopted and pursued an "Affirmative Action Plan" relating to the recruitment and employment of black persons (Plaintiffs' Ex. 91, Attach-

**2.** Derived from Plaintiffs' Ex. 88, Table 24 at pages 82 and 83. Table 16 of the same publication reflects a ratio of 11.1% for the SMSA and 15% for the City, but those figures include "Negro *and other races.*"

**3.** Derived from Plaintiffs' Ex. 89.

**4.** These figures are taken from Defendants' Ex. 17 and are not otherwise verified or corroborated in the record. Neither are they contradicted, however, and since they bear a reasonable relationship to the total, black person ratio of 10.8%, the Court accepts them as accurate.

ment E); and, among other things, there was a period of time in 1974 during which five points were arbitrarily added to the pre-employment test scores of black applicants in order to enhance the number of minority representatives meeting the minimum requirements established as a condition of employment.[5]

To be employed as a Police Officer as or a Firefighter an applicant must be between eighteen and thirty-five years of age and possess a high school education or G.E.D. equivalent; and must be of good moral character, free of any prior felony conviction or other offense involving moral turpitude (Plaintiffs' Ex. 91, Attachment A; see also Fla.Stat. 633.34 and 943.13).

In addition, with particular relevance to this case, each applicant must not have used marijuana at any time during the six month period immediately preceding his or her application—the so-called "six months clean time" rule—and each applicant must successfully pass a polygraph or "lie detector" examination concerning that question. (See Plaintiffs' Ex. 91, Attachment A).[6] From a racial standpoint, 49% of the black applicants and 51% of the white applicants successfully pass the polygraph examination. The "six months clean time" rule was established with particular reference to the Police Department because, according to Chief Vines, police officers are required to enforce the law prohibiting the possession or use of marijuana, and it was felt that a newly employed officer might be compromised as a witness or otherwise inhibited in the performance of his duty regarding marijuana if he, himself, has been a recent user.

There is no requirement in law or policy, nor has there ever been, that either Police Officers or Firefighters be residents of the City of St. Petersburg; and, in fact, approximately 40% of the applicants for those positions live outside the City limits and within the St. Petersburg—Clearwater—Tampa area, i. e., the Standard Metropolitan Statistical Area from which the City recruits its work force in general.

While some evidence was presented in the testimony and the exhibits concerning job positions other than Police Officer and Firefighter, and also some evidence concerning the number of promotions made in the Police and Fire Departments, and the procedures employed in making those promotions, such evidence is wholly insufficient to form the basis of any specific findings; and, accordingly, the Court will restrict its consideration to the issues surrounding the initial employment of Police Officers and Firefighters.[7]

(b.) *The Individual Plaintiffs.* Kenneth Drayton is a high school graduate with three years of college training and three years in the Air Force from which he was honorably discharged in 1972. In September, 1974, he obtained an employment application form from one of the City's minority recruiting offices and applied for a Firefighter position. He then took the employment test and was erroneously told that he had failed. When he made inquiry, however, the responsible clerk in the City's personnel office added five points to his test score in keeping with the then existing, affirmative action recruitment policy, and that resulted in a passing score.

On his application form (Plaintiffs' Ex. 35) Mr. Drayton represented that he had used marijuana a "few times" in the past, namely 1971 or 1972 (more than six months preceding his application); but he told the polygraph examiner he had used marijuana 50 to 100 times during 1970 to 1972 and, more significantly, was reported by the examiner to have given "deceptive" answers concerning his use of the drug during the preceding six months (see Plaintiffs' Ex. 36).

5. See discussion, *infra*, relating to Plaintiff Kenneth Drayton. No issue has been made concerning the use of pre-employment tests. (Pretrial Stipulation filed May 23, 1978).

6. Prior usage of heroin at *any* time also disqualifies an applicant.

7. Not only is there a paucity of evidence concerning promotions, the Plaintiffs' class consists of applicants, not existing employees seeking advancement.

Mr. Drayton's application was rejected, according to Chief Greenway and Mr. Fitzgerald (then a Personnel Officer with the City), because of the polygraph-indicated deception concerning use of marijuana during the preceding six months.[8]

Alfred A. Smith, a twenty-seven year old college graduate, applied for employment as a Firefighter in June, 1974 (see Plaintiffs' Ex. 1). He admitted during his initial polygraph examination that he had used marijuana two or three times during the preceding six months (see Plaintiffs' Ex. 2); and when he was subsequently re-examined at his request concerning the subject matter, the polygraph examiner reported "deception" in response to the question about marijuana usage during the last six months (see Plaintiffs' Ex. 3). His application was then rejected for that reason but he was encouraged to re-apply at the end of six months. He did not do so.

Mr. Smith filed a complaint with the Equal Employment Opportunity Commission on September 25, 1974 (Plaintiffs' Ex. 4), and received a "Notice of Right to Sue" letter from the EEOC on October 29, 1976 (Plaintiffs' Ex. 5).

Plaintiff Mary Hannan has a high school G.E.D. certificate plus one year of business education. She applied for employment as a Police Officer in November, 1973.

In answering questions on the form concerning health, Ms. Hannan stated that she had never been treated for a mental or nervous disorder (see Plaintiffs' Ex. 6). Subsequently, however, during her polygraph examination, Ms. Hannan admitted to the examiner that she had been treated by two psychiatrists during the period 1971 to 1973 for "an emotional problem," and the examiner recommended in his report that she not be employed "due to the fact she failed to mention [on her application form] an unknown emotional problem and feel this matter should be checked further." (Plaintiffs' Ex. 7). Accordingly, her application was rejected for that reason (see Plaintiffs' Ex. 8 and 9).

Ms. Hannan then requested and was given an interview concerning the reason for her rejection and, during the course of that interview, she stated to Mr. Waymire (Director of Police Operations) that she had orally explained her medical history to the person who had initially taken her job application form and, for that reason, had felt it unnecessary to include the information on the form itself. Accordingly, Waymire issued instructions that her application should be revived and that the background investigation should continue, particularly with regard to Ms. Hannan's past psychiatric treatment. (Plaintiffs' Ex. 10).[9]

Nevertheless, on March 22, 1974, Ms. Hannan was again notified that she had been rejected (Plaintiffs' Ex. 11); and by separate memorandum to Chief Vines (Plaintiffs' Ex. 12), Mr. Fitzgerald gave the following explanation:

"Ms. Hannan stated to Mr. Brock of our staff that she was employed in 1970 at Webb's City for a period of two months, though our investigation revealed she was there for less than a day. Her employment there was, in fact, terminated by the security chief who stated that he caught her shoplifting. He simply told her not to come back, however, and did not mention the shoplifting incident.

"When Ms. Hannan subsequently applied to J. M. Fields in 1972 she noted on her application there that her reason for leaving Webb's was that she was often left alone in the store and that she didn't feel safe.

---

8. Mr. Fitzgerald also testified that there was some concern about Mr. Drayton's medical history while in the Air Force of being forced to grow a beard to alleviate a skin condition caused by in-growing facial hair. Apparently, Firefighters are not permitted to grow beards because they prevent a seal between the skin and gas masks which must be worn during fire suppression activities. No weight will be given to this consideration, however, since the "six months clean time" rule is said by the City to be an absolute disqualification standing alone.

9. The physicians who had treated Ms. Hannan reported to the City that her former depression did not impair her present ability to function (see Plaintiffs' Ex. 14 and 21), and her ultimate rejection as an employee applicant was not predicated upon any medical cause.

"The reason she gave for leaving J. M. Fields was that she had no transportation to work. The assistant manager at J. M. Fields stated that she was terminated for absenteeism, having been habitually late and having missed three consecutive days without calling the store.

"Aside from these discrepancies, one reference supplied by Ms. Hannan stated she believed her to be untruthful and prejudiced, particularly in dealing with shoplifters when she worked at Sears as a security guard. One other co-worker did not recommend her for employment."

It should be noted that each of the adverse reports mentioned in Mr. Fitzgerald's memo were confirmed during the trial, i. e., the Security Chief at Webb's City (Fred Saccucci) testified that he had, in fact, terminated Ms. Hannan during her first day of employment there for what he believed to be a shoplifting incident, and that he had so informed the City's personnel office when inquiry was made about her employment history. Similarly, a co-worker with Ms. Hannan at Sears (Ann Hanson) confirmed that she had given the negative reference mentioned in the last paragraph of the Fitzgerald memo; and, with regard to her employment history at J. M. Fields, Ms. Hannan herself admitted at trial that due to difficulties in transportation she had simply abandoned that job without notice or explanation to the employer.

Following her second rejection, Ms. Hannan again inquired concerning the cause and, as a consequence, another polygraph examination was conducted with the result that the examiner reported, on May 28, 1974 "that applicant reacted indicative of deception in the area of theft of merchandise from places of employment, particularly specific questions relating to Webbs' City." (Plaintiffs' Ex. 13). Accordingly, Ms. Hannon was again notified of her rejection (see Plaintiffs' Ex. 20, 22 and 23).

Plaintiff Wallace Gipson applied in October, 1974, for the position of Detention Officer in the Police Department. (Plaintiffs' Ex. 33). He disclosed on his application that he had been arrested in Michigan in 1962 for the offense of "larceny from a building." (Id.; see also Defendants' Ex. 18). He was adjudged guilty of attempted larceny and placed on probation. During its background investigation the City was told by Michigan authorities that this constituted a felony conviction.[10] The City also developed information that Mr. Gipson had been incarcerated in 1970 upon revocation of another probationary term in a non-support proceeding, and that he had admitted to his Probation Officer that he had "snorted heroin" (see Defendants' Ex. 16). Accordingly, Mr. Gipson's application for employment was rejected. (Plaintiffs' Ex. 34).[11]

(c.) *Other Employees Hired By The City.* Both sides offered in evidence, for purposes of comparison with the backgrounds and qualifications of the named Plaintiffs individually, the personnel files of a number of Police Officers and Firefighters actually hired by the City.[12]

One group of files was offered by the Plaintiffs as evidence of the fact that a number of white Firefighters have been employed despite prior use of marijuana or other drugs. (Plaintiffs' Ex. 49, 50, 51, 52, 55, 56, 58 and 59). It does not appear, however, that any of those persons had ever used heroin, or that any had used marijuana during the critical six months period immediately preceding their applications. Indeed, the file of one of those white applicants suggests that he had once been rejected on an earlier date because of a recent use of marijuana within the prohibited six

---

10. It appears from the testimony of Mr. Gipson's Michigan Probation Officer, given at the trial of this case, that the 1962 offense was in fact a misdemeanor under Michigan law, but all those involved in the matter, including Mr. Gipson himself, had apparently treated the case as a felony conviction.

11. Mr. Gipson testified that he was later *accepted* by the City as an employee in another department but did not report for work because he was then pursuing his real estate license.

12. By stipulation of the parties these files were received *in camera* due to their confidential nature.

months period (see Plaintiffs' Ex. 51); and, in response to these examples, the Defendants offered the files of two black Firefighters who were employed despite their use of marijuana (which had occurred in both instances, as in the cases of the successful white applicants, more than six months prior to their employment). (See Defendants' Ex. 13 and 14).[13]

Another group of files was offered by the Plaintiffs as evidence of the fact that a number of white Firefighters and Police Officers had been employed by the City despite a record of prior arrests, or an unsatisfactory work history with prior employers, or the like (see Plaintiffs' Ex. 46, 47, 48, 53, 54, 57 and 60 pertaining to Firefighters, and Plaintiffs' Ex. 64, 68, 69, 73, 78, 80, 83 and 85 pertaining to Police Officers). Again, however, Defendants countered these examples by showing a number of black applicants who had been hired despite similar blemishes in their records (see Defendants' Ex. 11, 12 and 13 pertaining to Firefighters, and Defendants' Ex. 2, 3, 4, 5, 6, 7, 8, 9 and 10 pertaining to Police Officers).

## CONCLUSIONS OF LAW

The Court has jurisdiction of the parties and the subject matter. 28 U.S.C. § 1343(3) and (4); 42 U.S.C. §§ 1981, 1983 and 2000e et seq. (Title VII of the Civil Rights Act of 1964, as amended). While there was an issue during earlier stages of the case concerning the timeliness of the Title VII claim, that issue was effectively removed by the parties' pre-trial stipulation. (See Pretrial Statement filed May 23, 1978, paragraph 8.5).

The present development of the law is incomplete with regard to the standard of proof which must be established to warrant relief against a state, or any of its political subdivisions, in cases involving claims of racial discrimination in employment. It is established under Title VII (42 U.S.C. § 2000e et seq.), with regard to private employers, that it is unnecessary for a claimant to prove a racially discriminatory motivation on the part of the employer. A benign practice which is shown to have a discriminatory effect can be sufficient to warrant relief. *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). However in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Court held that a constitutional challenge of the employment practices of a governmental agency under 42 U.S.C. § 1981 can only be sustained by proof of a discriminatory motive or intent. Thus, the open question is whether the *Griggs* standard or the *Washington v. Davis* standard should be applied to public employers in cases brought under Title VII (first made applicable to state agencies by the Equal Employment Opportunity Act of 1972 effective March 24, 1972, Pub.L. 92-261, 86 Stat. 103). At least one court has held that proof of unlawful motive or intent is required as to Title VII claims, as well as claims made under § 1981, when the employer is a public body and not a private entity. *Scott v. City of Anniston*, 430 F.Supp. 508 (N.D.Ala.1977). But other courts have held to the contrary. See *United States v. City of Chicago*, 573 F.2d 416 (7th Cir. 1978). In this instance, however, it is unnecessary to resolve that precise issue. Except in one area of the case the Plaintiffs have failed to establish a prima facie showing of racial discrimination against them, individually or as a class, even if it is assumed that no proof of improper motive is required.

*Conclusions Concerning The Named Plaintiffs*

The effect of the evidence concerning Plaintiffs Drayton and Smith is substantially the same, and their cases may be considered together. Both applied at approximately the same time for the position of Firefighter in the Fire Department, and both were rejected for the same reason—use of marijuana during the preceding six

---

**13.** Defendants' Ex. 2, 3, 4, 5, 6 and 10 are examples of successful black applicants who were hired as Police Officers notwithstanding a history of marijuana use. Again, however, the use in each case apparently occurred more than six months prior to the application.

month period (established by admission of the applicant or by an "indication of deception" during a polygraph examination concerning the subject).

The so-called "six months clean time" rule was initially established as a condition of employment by the Police Department for completely rational, salutary and non-discriminatory reasons. The rule, together with other prescribed conditions and qualifications, was then borrowed and adopted verbatim by the Fire Department; and there is no evidence, nor any inference, that the rule was either conceived or applied in bad faith concerning the employment of Firefighters generally or the rejection of Plaintiffs Drayton and Smith individually. In none of the many files of white Firefighters introduced by the Plaintiffs does it appear that an applicant was hired despite marijuana usage within the preceding six months; and to the extent that past use of marijuana at earlier times was proved to be no obstacle to employment of whites, Defendants proved that neither is it an obstacle to employment of blacks.

■ To be sure, apart from the desire of any employer to recruit law abiding employees, there would seem to be no logical nexus whatever between recent marijuana usage and employment as a Firefighter (as distinguished from employment as a Police Officer); and if there was evidence of disparate impact according to race as in *Griggs*, relief might well be warranted on this issue. There is, however, no such evidence.[14]

■ In the case of Wallace Gipson the City was credibly informed and justly believed that he was a convicted felon[15] and a former user of heroin. Either of those conditions was sufficient to disqualify him under the City's established hiring criteria, and there is no evidence that those criteria were inspired by improper considerations of race or that their application results in different treatment of applicants according to race. Specifically, there is no showing that any white has been hired with a felony conviction or evidence of possible heroin usage in his background; nor, conversely, is there evidence that black people have been rejected in disparate numbers because of those factors.

■ In the case of Mary Hannan the City developed information during its routine background investigation that she had been fired from one job for shoplifting; that she misrepresented that history in subsequent applications (to J. M. Fields and to the City); that she abandoned another job without notice; that one of her former co-workers gave her a negative reference as a prospective employee; and that, upon being given a successive polygraph examination concerning the shoplifting incident, the examiner opined that her denial was deceptive. Whether to hire or not to hire a person of that background as a City Police Officer is, of necessity, a matter of judgment or subjective evaluation; and while it is true that a number of white officers were shown to have something less than impeccable work histories at the time they were hired, none would appear to be quite as unfavorable as that of the Plaintiff Hannan.[16] In addition, as previously noted, De-

14. As stated in the Findings of Fact, the testimony was that 49% of the black applicants and 51% of the white applicants successfully pass the polygraph examination. That examination, of course, also involves inquiry concerning matters other than recent marijuana usage, but the inference is that approximately the same number of blacks meet the "six months clean time" rule as do whites. In any event, there is no contrary evidence.

It should be noted that while the Plaintiffs also object to the polygraph itself, its use by the City must be exonerated for the same reason, i. e., there is no evidence of either a discriminatory motive or a disparate impact upon black applicants. A ratio differential of 51 to 49 cannot be regarded as significant.

15. That he was, in fact, a convicted misdemeanant is irrelevant. The issue is whether the City believed, in good faith, that he was a felon and acted on that belief as opposed to racial considerations. In any event, it would appear that the offense was one involving "moral turpitude" regardless of its classification as a felony or misdemeanor under Michigan law.

16. Perhaps the most unfavorable of these files is Plaintiffs' Ex. 83 pertaining to an applicant with respect to whom Defendant Vines testified

fendants demonstrated examples of other *black* applicants who also had somewhat undesirable employment backgrounds (akin to those of the white applicants just mentioned), all of whom were accepted as employees thus producing a clear inference that race was not a consideration in the rejection of Ms. Hannan.

■ In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court held in respect to individual Title VII claims that the order or burden of proof at trial, as well as the analysis of the evidence after trial, should proceed in the following sequence: (a) the Plaintiff must establish a prima facie case by showing that he belongs to a racial minority, that he applied and was qualified for a job for which the employer was seeking applicants, that he was nevertheless rejected, and that the employer thereafter continued to seek applicants from persons of the Plaintiff's qualifications; (b) the employer must then articulate some legitimate, non-discriminatory reason for Plaintiff's rejection and (c) Plaintiff must then be afforded an opportunity to show that the employer's stated reason for his rejection was in fact pretext.

It is appropriate, therefore, to conclude consideration of the individual claims of the named Plaintiffs by summarizing the foregoing findings and conclusions in the *McDonnell Douglas* mold.[17]

Plaintiff Hannan established a prima facie case by showing that she is black, that she applied for the position of Police Officer for which she was ostensibly qualified, and that she was nevertheless rejected although the City continued to recruit other persons for that position. The City's articulated response, supported by a preponderance of

the evidence, was that Ms. Hannan had falsified her application and that her past employment history was so poor as to fully justify the nondiscriminatory conclusion that she would be an unreliable if not an undesirable employee, particularly as a Police Officer. Plaintiffs' rebuttal evidence, designed to puncture the City's explanation and expose it as pretext, was ineffectual. While other white applicants have been employed despite such things as having been fired from previous jobs, and the like, it is clear that other *black* applicants have been hired under the same conditions; and, considering the totality of the circumstances, a preponderance of the evidence compels the conclusion that Ms. Hannan was rejected for non-pretextual reasons unrelated to her race.

As to Plaintiffs Drayton and Smith, one of the established and publicized qualifications an applicant must demonstrate as a requisite to employment as a Firefighter is abstention from the use of marijuana for the preceding six months *and* the ability to withstand a polygraph examination concerning the truthfulness of that assertion. Taking that approach in making a *McDonnell Douglas* analysis, it is apparent that neither of these Plaintiffs established even a prima facie case. However, if one takes the view that proof of their membership in a racial minority and evidence of their basic qualifications (as to age and education) was sufficient to shift the burden to the City, then the ultimate issue is whether the "six months clean time" rule is pretextual, particularly as applied to Firefighters. Plaintiffs have not proved it to be so. While one might question the wisdom or logical necessity of such a policy in the recruitment of Firefighters, there is no evidence that any white has been hired contrary to the "rule;"

at trial that there was a "serious question" as to whether he should have been employed. The employee's prior work history closely parallels that of Plaintiff Hannan, but is certainly no worse.

**17.** While the legal effect of the statistical evidence will be discussed *infra* in relation to the class action issues, the Court has considered that evidence in evaluating the Plaintiffs' indi-

vidual claims. For the reasons subsequently stated, however, the statistics are of no aid to the Plaintiffs; and, even if the statistical data was favorable to their position so as to aid in establishing a prima facie case concerning their individual claims, the preponderance of the evidence compels the conclusion that the City acted for non-discriminatory, non-pretextual reasons in rejecting them.

and conversely, the weight of the evidence is that both races are treated equally regarding prior usage of marijuana.[18]

Similarly, as to Plaintiff Gipson, the City's articulated reasons for his rejection were his past criminal record and evidence of his usage of heroin. These reasons were not pretextual.

■ It follows, therefore, that none of the named Plaintiffs have established their individual claims, and none are entitled to individual relief.[19]

*Conclusions Concerning The Class Action Claims*

■ No black Firefighter was ever hired by the City of St. Petersburg prior to March 24, 1972 (the effective date of the Equal Employment Opportunity Act of 1972 which extended coverage of Title VII to the states and their political subdivisions). That stark fact alone is persuasive evidence that the City Fire Department was guilty of pre-Act discrimination, and such evidence, as well as the conclusion to be drawn from it, was not rebutted.

In all other respects, however, including the employment practices of the Fire Department itself since 1972, a preponderance of the evidence demonstrates that the City has followed a racially non-discriminatory employment policy. In fact the evidence clearly shows that the City has pursued an affirmative action program as an equal opportunity employer, actively soliciting black applicants for employment.

In analyzing the statistical evidence, two threshold decisions must be made: (a) what is the relevant labor market; and (b) what is the percentage of black persons within that market area having the necessary qualifications (as to age and education). *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

■ The City of St. Petersburg has a significantly larger population of black persons than the Standard Metropolitan Statistical Area (Findings of Fact *supra,* page 850), and the Plaintiffs contend that the geographical city limits should be regarded as the relevant labor market for the purpose of statistical comparison in this case. Their sole argument in support of this contention is that the City Police and Fire Departments should be required to mirror the racial composition of the City's general population because the area within the City limits constitutes the geographic area *served* by the City's employees including the Police and Fire Departments in particular. There is no evidence, however, that a substantial majority of the existing work force lives within the City or that applicants for employment are or have been concentrated in that area. On the contrary, the only evidence pertinent to this issue is to the effect that there is no requirement in state law or policy that municipal employees be residents of the City[20] and, in fact, a

---

18. In *McDonnell Douglas* the Court expressly reserved decision as to "whether, or under what circumstances, unlawful activity not directed against the particular employer may be a legitimate justification for refusing to hire." 411 U.S. at 803, n. 17, 93 S.Ct. at 1825, n. 17. It is self-evident, however, absent a finding that imposition of such a condition of employment is either racially motivated or racially discriminatory in its application or effect, that there is no demonstrated violation of the statute which requires proof of discrimination "because of race." 42 U.S.C. § 2000e–2(a)(1).

19. Given the earlier certification of this case as a class action pursuant to Rule 23(b)(2), Fed.R. Civ.P., the failure of the named Plaintiffs' individual claims does not affect their capacity to represent the class or the continuation of the

case as a class action. See *Satterwhite v. City of Greenville,* 578 F.2d 987 (5th Cir. 1978) (en banc).

20. A restriction of municipal employment to those persons residing within the city is a concept having some logical appeal and is not without precedent. See *McCarthy v. Philadelphia Civil Service Commission,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976). The imposition of such a restriction, however, is clearly a policy choice to be made by the appropriate state or local legislative body; and, unless that choice has already been made as a matter of law, the relevant labor market must be determined on the basis of historical fact and peculiar contemporary conditions, if any, in the labor market itself.

substantial portion of the City's employees and employee applicants (40%) live outside the City limits and within the SMSA. (Findings of Fact *supra*, page 851). Under these circumstances, therefore, the relevant labor market for statistical comparison purposes is the Tampa-St. Petersburg-Clearwater Standard Metropolitan Statistical Area. See *Equal Employment Opportunity Commission v. E. I. duPont de Nemours & Co.,* 445 F.Supp. 223, 236–38 (D.Del. 1978). See also *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 271–72 (10th Cir. 1975).

It has already been determined (Findings of Fact *supra*, page 850) that the ratio of qualified [21] black persons in the SMSA, i. e., those between 18 and 35 years of age with a high school education, is 9.6%; and the ratio of black males having those qualifications is 8.3%.

Following *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Supreme Court in *Hazelwood School District* approved calculation of the "standard deviation" [22] as a measure of predicted fluctuations from the expected value of a known sample.

In 1976 the total number of employees in the Police Department was 697 of whom 645 or 92.5% were white and 52 or 7.5% were black. (Findings of Fact *supra*, pages 849–850). The standard deviation is approximately 7.75. The expected value would be approximately 67 black employees (697 × .096) whereas the actual or observed value was 52, a difference of 15 which is slightly less than two standard deviations. At the same time (1976) the total number of

uniformed employees in the Police Department was 481 of whom 456 or 94.8% were white and 25 or 5.2% were black. The standard deviation is approximately 6.45. The expected value would be approximately 46 black employees (481 × .096) whereas the actual or observed value was 25, a difference of 21 which is slightly more than three standard deviations. In 1978, however, the total number of uniformed employees in the Police Department was 469 of whom 434 or 92.5% were white and 35 or 7.5% were black. The standard deviation is approximately 6.4. The expected value would be approximately 45 black employees (469 × .096) whereas the actual or observed value was 35, a difference of 10 which is less than two standard deviations. Finally, and perhaps most significantly, there have been 363 Police Officers hired from March 24, 1972 through May 9, 1978, of whom 318 or 87.6% were white and 45 or 12.4% were black. The standard deviation is approximately 5.6. The expected value would be approximately 35 black employees (363 × .096) whereas the actual or observed value was 45, a difference of something less than two standard deviations on the positive side.

■ Accordingly, insofar as the Police Department is concerned, there is simply no evidence of racially discriminatory acts in the hiring process occurring either before or after the 1972 Act, and the statistical evidence fails to demonstrate a gross disparity in the racial composition of the work force so as to raise an inference or establish a prima facie case of discrimination.

---

**21.** "When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Hazelwood School District, supra,* 433 U.S. at 308, n. 13, 97 S.Ct. at 2742, n. 13. *See also Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620–21, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974).

**22.** The "standard deviation" is the square root of the product of the total number in the sample (the employee group under review) times the probability of selecting a qualified black person (the ratio of qualified blacks in the relevant labor market area) times the probability of

selecting a non-black person (the ratio of the remaining population). If the difference between the expected value (the ratio of the qualified black persons in the relevant market area applied to the total number in the sample or employee group under review), and the observed value (the actual number of black persons in the employee group), is more than two or three times the size of the "standard deviation," then the disparity may be attributed to factors other than random or racially neutral selection procedures. See *Castaneda,* 430 U.S. at 496, n. 17, 97 S.Ct. at 1281, n. 17; *Hazelwood School District,* 433 U.S. at 311, n. 17, 97 S.Ct. at 2743, n. 17.

Analysis of the fragmentary statistical evidence pertaining to the Fire Department produces essentially the same result. In 1976 the Fire Department had 314 white male employees (96.9%) and 10 black male employees (3.1%).[23] The standard deviation is approximately 5. The expected value would be approximately 27 black male employees (324 × .083) whereas the actual or observed value was 10, a difference of 17 which is slightly more than three standard deviations. As of May 1, 1978, there were 228 Firefighters of whom 219 or 96.1% were white and 9 or 3.9% were black. The standard deviation is approximately 4.4. The expected value would be approximately 22 black employees (228 × .096) whereas the actual or observed value was 9, a difference of 13 which is slightly less than three standard deviations. Between March 24, 1972 and May 9, 1978, the City employed 124 new Firefighters of whom 112 or 90.3% were white and 12 or 9.7% were black. The standard deviation is approximately 3.3. The expected value would be approximately 12 black employees (124 × .096) and the observed value was precisely that, 12 black employees.

Thus, as in the case of the Police Department, there is simply no evidence of racially discriminatory acts in the Fire Department's employment process after the 1972 Act, and the statistical evidence fails to demonstrate any gross disparity in the racial composition of those employed as Firefighters since that time.

In *Hazelwood School District, supra,* the Court held:

"Racial discrimination by public employers was not made illegal under Title VII until March 24, 1972. A public employer who from that date forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes." 433 U.S. at 309, 97 S.Ct. at 2742.

█ It follows that the Defendants are entitled to judgment against the Plaintiffs and the class they represent with respect to all claims made under Title VII; and are also entitled to judgment with respect to the § 1981 and 1983 claims insofar as the Police Department is concerned. However, as the Supreme Court was also careful to point out in *Hazelwood*, "a public employer [as distinguished from one in the private sector] even before the extension of Title VII in 1972 was subject to the command of the Fourteenth Amendment not to engage in purposeful racial discrimination." 433 U.S. at 309–10, n. 15, 97 S.Ct. at 2742–43, n. 15. The Court remains in doubt, therefore, both factually and legally, concerning the continuing effect, if any, of the City's pre-Act discrimination in the employment of Firefighters by the Fire Department. Although the fact of that discrimination is clear, there is too little evidence of the present composition of that Department to justify any detailed findings concerning the continuing contemporary effect of such past discrimination, if any, or to fashion an appropriate remedy if, indeed, any remedy is appropriate beyond or in addition to the City's on-going affirmative action program. There is also doubt as to the applicable law following *Hazelwood*, i. e., whether and to what extent pre-Act discrimination by a public employer continues to be a remediable wrong rather than "an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).

It is appropriate, therefore, for the Court to reserve ruling upon that aspect of the

---

23. The record is unclear concerning the significance or probative value of the data pertaining to *males* either as existing employees or as potential applicants in the relevant labor market. The City's written selection standards for Firefighters as adopted in May, 1974, expressly provide that: "In no case will an applicant be removed from consideration because of . . sex." (Plaintiffs' Ex. 91). Thus, in analyzing the 1976 data pertaining to male employees, the Court will utilize for comparison purposes the ratio of qualified black males in the SMSA labor market (8.3%). Otherwise, however, the ratio of qualified black *persons* will be used (9.6%). (See Findings of Fact *supra,* page 850).

case pending the development of additional factual data and the submission of additional briefs by the parties concerning these issues. The Defendant City of St. Petersburg is directed to prepare and file with the Court within thirty (30) days from the date of this Order, detailed information including, but not limited to, a description of each employee job classification within the Fire Department beginning as of March 24, 1972 to date; the number of employees employed in each such job classification by race and sex as of the end of each calendar quarter commencing July 1, 1972, to date; and the number of applicants employed into each such job classification by race and sex during each calendar quarter from July 1, 1972 to date. Any significant and sudden increases or decreases in the number of employees in the Department or in any given job classification or classifications within the Department should be explained; and in the event any of the specified information is unavailable, then all relevant data of similar import that is available shall be arranged and presented to the fullest extent possible.

Within twenty (20) days after the filing of such additional information by the City, the parties are requested to submit supplemental briefs concerning (a) whether there is any continuing effect of pre-Act discrimination in hiring by the City's Fire Department; (b) if so, whether and to what extent that condition is subject to remedy under prevailing law; and (c) if so, the appropriate remedy, if any, which should be decreed on the merits of the case factually. The Court will then schedule such additional hearings, if any, as the circumstances may seem to require.

Pending accomplishment of these additional or supplemental proceedings, the entry of a final judgment or decree will be withheld.

IT IS SO ORDERED.

1. The term "pre-Act discrimination" refers to discriminatory acts or practices which occurred prior to March 24, 1972, the effective date of

## SUPPLEMENTAL OPINION

In the Findings of Fact and Conclusions of Law entered in this action on March 7, 1979, the Court concluded that the Defendants were entitled to judgment against the Plaintiffs and the class they represent with respect to all claims asserted in the case under Title VII of the Civil Rights Act (42 U.S.C. § 2000e et seq.). The Court also concluded that the Defendants were entitled to judgment with respect to all claims brought under 42 U.S.C. §§ 1981 and 1983 insofar as the City of St. Petersburg Police Department is concerned. However, with respect to the Fire Department, the Court found purposeful, pre-Act discrimination[1] in the employment of Firefighters, and the parties were directed to submit additional factual data and legal memoranda concerning the appropriate contemporary remedy, if any, which should be awarded under those circumstances. That has now been accomplished.

With respect to the number and percentage of black Firefighters hired since July 1, 1972, and the composition of the firefighting force at year end 1978, the additional data submitted by the City may be summarized as follows:

Firefighters Hired (1972–1978)

| White (%) | Black (%) | Total |
|---|---|---|
| 130 (92.1%) | 11 (7.9%) | 141 |

Firefighters Work Force (Year End 1978)

| White (%) | Black (%) | Total |
|---|---|---|
| 297 (97%) | 9 (2.9%) | 306 |

While these figures vary somewhat from the corresponding data previously submitted (see p. 850 and pp. 858–859, of the Findings and Conclusions entered March 7, 1979), due at least in part to the use of slightly different time periods which provide more current information, they still confirm the principal conclusion already reached: namely, that the City's employment practices since 1972 (and the effective application to it of Title VII) have been

the Equal Employment Opportunity Act of 1972, Pub. L. 92–261, 86 Stat. 103, extending the provisions of Title VII to public employers.

racially non-discriminatory.[2] In addition, however, they also supply the answer to the question which could not be clearly resolved before: namely, the current or continuing effect, if any, of the City's pre-Act discrimination in the employment of Firefighters. Unfortunately, the plain answer is that the City's voluntary affirmative action program has not succeeded in eradicating the effect of pre-Act discrimination, the continuing result of which is easily demonstrated. At the end of last year there were 306 Firefighters of whom 297 or 97% were white and 9 or 2.9% were black. The standard deviation is approximately 5. The expected value would be approximately 29 employees (306 × .096) whereas the actual or observed value was 9, a difference of 20 or four times the standard deviation. A disparity of that magnitude must be attributed to factors other than random or racially neutral selection procedures. *Castaneda v. Partida*, 430 U.S. 482, 496, n. 17, 97 S.Ct. 1272, 1281, n. 17, 51 L.Ed.2d 498 (1977); *Hazelwood School District v. United States*, 433 U.S. 299, 311, n. 17, 97 S.Ct. 2736, 2743, n. 17, 53 L.Ed.2d 768 (1977).

■ The Court now concludes, therefore, that there is a present and continuing effect of the City's pre-Act discrimination in the employment of Firefighters. The legal question remains, however, as to whether that circumstance now justifies a remedy. In *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the Court held a Title VII claim to be time barred even though the *effect* of an earlier discriminatory act continued to the present in the form of disparate seniority rights. The Court said ". . . the emphasis should not be placed on mere con-

tinuity; the critical question is whether any present *violation* exists." Id. 97 S.Ct. at 1889. In the context of this case, therefore, the question is whether any violation occurred within the applicable limitations period preceding the filing of the action. The suit was filed on February 18, 1975, and with respect to the claim under 42 U.S.C. § 1981 for injunctive relief, the applicable limitations period would be four years. Florida Statute 95.11(3)(f); *Bennett v. Georgetown Manor, Inc.*, 452 F.Supp. 590 (S.D.Fla.1978). Compare, *Cutliff v. Greyhound Lines, Inc.*, 558 F.2d 803 (5th Cir. 1977). Accordingly, since the Court has found the existence of purposeful discrimination until March, 1972, a point in time well within the applicable limitations period, *United Air Lines, Inc. v. Evans, supra*, is inapposite to this case.

The appropriate remedy is to require the City to employ at least one, otherwise qualified black Firefighter for each two, white Firefighters hereafter employed until such time as the number of black Firefighters is equivalent to 9.6% of the total Firefighter work force.[3] *See, NAACP v. Allen*, 493 F.2d 614 (5th Cir. 1974); cf., *United Steel Workers of America v. Weber*, —— U.S. ——, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). It is, therefore,

ORDERED and ADJUDGED:

1. The Defendants, City of St. Petersburg and Zelmar Greenway, as Fire Chief, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal

---

2. Following the statistical analysis explained in the footnote on page 858 of the Findings and Conclusions entered March 7, 1979, the "standard deviation" with regard to Firefighters hired since 1972 would be 3.5; the expected value would be approximately 13 or 14 black employees (using 9.6% as the ratio of black persons in the SMSA having the requisite qualifications for employment); and the observed value was 11, a difference of 2 or 3 which is less than one standard deviation.

3. To the extent that the Plaintiffs continue to press for relief concerning the promotion of black Firefighters to officer or supervisory levels, such relief is denied because (1) there is no evidence of contemporary discrimination in that regard, and (2) the Plaintiffs do not represent, and have not been certified as representatives of, existing employees. For the same reason, however, the denial of that relief here (even though it is sought by these Plaintiffs) is without prejudice to any future claim that might be made in behalf of existing black employees.

862

service or otherwise, are hereby permanently and mandatorily enjoined to employ at least one otherwise qualified black Firefighter for each two white Firefighters hereafter employed until such time as the number of black Firefighters is equivalent to at least 9.6% of the total Firefighter work force.

2. The Defendants, City of St. Petersburg and Zelmar Greenway, as Fire Chief, are directed, pending further order of the Court, to file with the Court and serve upon Plaintiffs' counsel a written report each time a Firefighter or group of Firefighters is employed. Such report shall disclose the race of each such newly employed Firefighter; the total number of Firefighters' force then employed by the City; and the racial composition of the force of Firefighters.

3. Jurisdiction of this cause is reserved for the purpose of modifying, supplementing or enforcing this decree.

4. Except for the relief awarded in paragraphs 1 and 2 above, all other claims heretofore made or asserted by the plaintiffs in this cause for themselves, individually, or for the class they have been certified to represent pursuant to Rule 23(b)(2), are hereby DENIED, and each and all of such claims are hereby DISMISSED with prejudice.

5. The Clerk shall assess costs in favor of the Plaintiffs and against the Defendants.

IT IS SO ORDERED.